UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWNTIA D. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 6789 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| COMPASS GROUP, CROTHALL HEALTHCARE, | ) | |
| INC., and CLAYTON SMITH JR., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Shawntia Brown filed this lawsuit against her former employers, Compass Group and Crothall Healthcare, Inc., and her former supervisor, Clayton Smith Jr. Generously read, the amended complaint purports to state claims for: (1) discrimination based on race and sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and 42 U.S.C. §§ 1981, 1983, and 1985; (2) retaliation in violation of Title VII and §§ 1981, 1983, and 1985; and (3) slander and libel. Doc. 18. Defendants moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6), Doc. 19, and the court set a briefing schedule, Doc. 23. After Brown failed to respond to the motion, the court dismissed most of her claims. 2012 WL 1231064 (N.D. Ill. Apr. 12, 2012). Surviving dismissal were the Title VII claims against Compass Group and Crothall Healthcare and the § 1981 claims against all Defendants. *Id*. at *2.

A discovery period ensued in which Plaintiff—who initiated the case *pro se* but who has been represented by counsel since February 28, 2012, Doc. 30—repeatedly failed to comply with her discovery obligations. Docs. 35-36, 43, 67, 69, 75. After discovery closed, Defendants moved for summary judgment on the claims that survived dismissal. Doc. 81. The court set a briefing schedule, which ordered Brown to respond to the motion by December 14, 2012. Doc.

85. On January 3, 2013, nearly three weeks after her response was due, Brown moved for extension of time to respond. Doc. 86. The court denied that motion because it was not accompanied by the notice of presentment required by Local Rule 5.3(b), which provides in relevant part that "[e]very motion or objection shall be accompanied by a notice of presentment specifying the date and time on which, and the judge before whom, the motion or objection is to be presented." Doc. 87. Brown did not renew her motion for an extension of time. Defendants then filed a short "reply" noting that Brown had failed to oppose their summary judgment motion. Doc. 88. For the following reasons, the motion is granted.

**Background**

Because Brown did not file a Local Rule 56.1(b)(3)(B) response to Defendants' Local Rule 56.1(a)(3) statement of facts, the court will accept as true the facts set forth in Defendants' statement, viewing those facts and inferences therefrom in the light most favorable to Brown. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009) (citing Local Rule 56.1(b)(3)(C)) ("In accordance with a local rule, the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1108-09 (7th Cir. 2004); *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003). Brown also failed to file a brief in response to Defendants' summary judgment motion. That said, the court is mindful that

"a nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not, of course, automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the movant] to show that it is entitled to judgment as a matter of law." *Raymond*, 442 F.3d at 608. Accordingly, the court will recite the uncontroverted material facts in Defendants' Local Rule 56.1(a)(3) statement and then proceed to determine whether, on those facts, Defendants are entitled to summary judgment.

**Background**

Defendant Crothall Healthcare is a subsidiary of Defendant Compass Group. Doc. 83 at ¶ 2. Crothall provides equipment maintenance services to hospitals. *Ibid*. At all relevant times, Crothall had a contract to provide services to Methodist Hospitals in Indiana. *Id*. at ¶ 3. Brown was hired by Crothall as a permanent employee in November 2007. *Id*. at ¶ 11. She was an administrative assistant in Crothall's Clinical Engineering Department and was responsible for secretarial and office work, including answering phones, taking messages, preparing and maintaining reports such as purchase order logs, and performing other clerical duties at the direction of the department's head. *Id*. at ¶ 12.

Brown had performance issues throughout her time at Crothall. In her performance reviews from December 2008 and December 2009, the director of Brown's department, Timothy Campbell, wrote that she "needs to be better organized with her paperwork and filing them in a timely manner." *Id*. at ¶¶ 20-22. Brown does not claim that Campbell ever discriminated against her. *Id*. at ¶ 23. In June 2010, Brown sent an email accusing the Director of Peri-Operative Services at Methodist of hanging up on her, accused that individual of being "rude and disrespectful to say the least," and told that individual that she should be more professional. *Id*. at ¶ 24. Also in June, one of Brown's supervisors, Alfred Mendoza, asked her to get a chart for

Crothall's regional vice president, William Rothgery, but when Mendoza followed up with her the next day, Brown claimed that he had not made the request. *Id*. at ¶ 25. In July 2010, Rothgery told Brown that she needed to take a more professional tone in her contacts with Crothall's service providers after Brown criticized a provider in an email on which the provider was copied. *Id*. at ¶ 26.

Defendant Smith was hired by Crothall in July 2010 to oversee the Methodist account and the Crothall employees working on that account, including Brown. *Id*. at ¶ 4. Crothall tasked Smith with turning around the Methodist account because Methodist was dissatisfied with Crothall and had threatened to cancel their contract. *Id*. at ¶ 5. In October, Smith fired Campbell (who is white, *id*. at ¶ 61) for performance issues. *Id*. at ¶ 28. Smith then increased his personal coaching of the entire staff, seeking to improve their performance in an effort to satisfy Methodist. *Id*. at ¶ 29. Smith told Brown that Smith's delegation of duties might differ from Campbell's and that she should therefore be ready for changes to her responsibilities. *Id*. at ¶ 33.

In October 2010, Crothall received a complaint from a manager at Methodist, who said that Brown had been telling Methodist to buy equipment, which fell outside her duties. *Id*. at ¶¶ 35-36. In November, Smith reminded Brown that she should not talk to Methodist staff about purchasing equipment. *Id*. at ¶ 37. Brown responded with an argumentative email to Smith and Mendoza, and then challenged Smith further in person. *Id*. at ¶ 38. In addition, Brown failed to perform her job duties adequately; she did not relay messages appropriately and she interfered with a unit director's attempt to train other staff. *Id*. at ¶ 40.

In December 2010, Mendoza sought approval to buy antivirus software; Smith, assuming the software was for the Methodist account, approved the purchase. *Id*. at ¶ 42. Smith later learned that the software was actually for Crothall's Clinical Engineering Department, which led

4

him to retract his approval because he wanted to look into the cost himself to see if Crothall could save money. *Id*. at ¶ 43. On December 3, Brown argued with Smith because Smith would not let her purchase the software. *Id*. at ¶ 44. During the dispute, Brown stood over Smith at his desk and raised her voice. *Id*. at ¶ 45. When Smith told Brown he had to leave for a meeting, Brown followed Smith and told him not to turn his back on her. *Id*. at ¶ 46. Brown's behavior made Smith feel physically threatened. *Id*. at ¶ 47. Later that day, Brown called Rothgery and told him that Smith had acted unprofessionally toward her and had called her a "tattletale"; Brown did not say anything about race or discrimination at that time. *Id*. at ¶ 48.

The next day, Smith suspended Brown for insubordination and asked her to leave immediately. *Id*. at ¶ 49. Rather than leave, Brown continued to type on her computer, so security was called to escort her off of the premises. *Id*. at ¶ 50. Later that day, Brown called Crothall's Human Resources Department to report that she had been suspended for telling Smith not to walk away from her. *Id*. at ¶ 51. She also called Crothall's hotline to report the software incident with Smith; she complained of his "unprofessional behavior that has negatively affected the company," said that he "treats her unfairly because she is African American," and confirmed that she had not previously reported her concerns to human resources or management. *Id*. at ¶ 52. The same day, another unit director at Crothall, John LeRoux, emailed Smith with his own account of Brown's performance and behavioral issues, stating that she greeted Methodist's staff forcefully, was critical of attempts to build a relationship with Methodist's staff, and worked on her jewelry side business at work. *Id*. at ¶ 53. Brown was suspended for two days with pay, and then took two vacation days without asking permission from her supervisor. *Id*. at ¶ 54.

Smith wanted to fire Brown at that point, but human resources determined that she should be given another chance. *Id*. at ¶ 55. At a December 10 meeting, Smith, Mendoza, and a human

resources employee delivered a Final Progressive Counseling and 2010 Performance Review to Brown. *Id*. at ¶ 56. The Final Progressive Counseling outlined Brown's insubordination and threatening and intimidating behavior from October 2010 onward and admonished her to improve her conduct immediately. *Id*. at ¶ 57. The 2010 Performance Review noted that Brown needed improvement in completing the purchase order logs, reporting issues to management, following directives, and completing her tasks in a timely fashion; it also stated that she had become argumentative and combative. *Id*. at ¶ 58. Crothall's employee policy includes insubordination as an offense that normally results in strong disciplinary or corrective action, potentially including suspension or discharge; the policy also states that "lack of application or effort on the job" and "incompetence or failure to meet reasonable standards of efficiency" will ordinarily warrant the use of management tools to address the problem. *Id*. at ¶ 9.

Brown appealed her suspension and the Progressive Counseling to human resources and Rothgery. *Id*. at ¶ 59. The appeal did not suggest that Brown believed that race had played a role in Smith's treatment of her; indeed, it stated that Smith was treating her like Campbell, the white manager whom Smith had fired. *Id*. at ¶¶ 60-61. After reviewing the appeal, human resources and Rothgery upheld Smith's disciplinary actions and told Brown that she needed to change her behavior. *Id*. at ¶ 62.

Going forward, Brown continued to resist instruction and failed to perform her duties, organize files properly, or complete her assignments on time and in the manner requested by her supervisors. *Id*. at ¶ 65. Brown was asked several times in December 2010 and January 2011 to organize various binders, and she did not do so. *Id*. at ¶¶ 66-67. Also in December, Brown was asked to run a report of purchase orders for Smith, but she resisted doing so multiple times even though she was aware that Smith was entitled to make this request of her. *Id*. at ¶ 68. In

January, Smith asked Brown to create a personnel contact list, but Brown said that this was not necessary and resisted completing the task. *Id*. at ¶ 69. Brown also failed to comply with instructions not to include staff members on emails that did not pertain to them. *Id*. at ¶ 71. She disrupted the workplace by telling a staff member that the changes to payroll handling could impact Christmas paychecks. *Id*. at ¶ 72. She also continued to fail to log purchase orders in a timely fashion, to keep records organized, or to convey phone messages accurately. *Id*. at ¶ 73.

On January 13, 2011, Smith and Mendoza agreed that Brown was not trying to improve her performance, and Smith recommended to human resources and Rothgery that she be fired. *Id*. at ¶ 74. Rothgery and human resources agreed that Brown should be fired. *Id*. at ¶ 75. On January 17, Smith and Mendoza told Brown that she was being fired and provided her with a termination document that summarized the reasons for her firing, including her lack of improvement and her inappropriate conduct since the Progressive Counseling meeting on December 10. *Id*. at ¶ 76.

On January 20, 2011, Brown filed a discrimination charge with the EEOC, alleging discrimination on the basis of race and sex and retaliation, occurring from December 6, 2010, through January 17, 2011. *Id*. at ¶ 1; Doc. 83-1 at 2. The EEOC issued Brown a right to sue letter on June 28, 2011. Doc. 83 at ¶ 1.

Prior to filing her EEOC charge, the only time that Brown ever complained that Smith was treating her differently on the basis of race was in her phone call to Crothall's hotline after her suspension on December 6, 2010. *Id*. at ¶ 79. Neither Smith nor Rothgery was aware of Brown's reference to race discrimination during that call, and nor did they know until after her termination that she attributed her discipline and termination to Smith's treating her differently on the basis of race. *Id*. at ¶ 80.

**Discussion**

I. **Race Discrimination Claims**

The amended complaint claims that Brown was "treated differently than white employees at Crothall Healthcare INC, in terms of compensation, training, promotion, discipline, employment and accountability because of race," and also that she was fired on account of her race. Doc. 18 at ¶ 6. Employment-related race discrimination claims under Title VII and § 1981 are analyzed under the same framework, so the court will simplify by referring only to Title VII doctrine and precedents. *See Smith v. Bray*, 681 F.3d 888, 895-96 & n.2 (7th Cir. 2012); *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010) ("The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983."). A Title VII race discrimination plaintiff may seek to defeat summary judgment under the direct and indirect methods of proof. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Rodgers v. White*, 657 F.3d 511, 516-17 (7th Cir. 2011). The court will consider whether Brown can defeat summary judgment under either method, with the relevant facts being those set forth in Defendants' Local Rule 56.1(a)(3) statement. *See Koszola*, 385 F.3d at 1109 ("a district court is entitled to decide the motion based on the factual record outlined in the Local Rule 56.1 statements") (brackets and internal quotation marks omitted).

"Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman*, 667 F.3d at 845. The appropriate focus under the direct method "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks omitted); *see also*

8

*Everett v. Cook Cnty.*, 655 F.3d 723, 729 (7th Cir. 2011); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. In short, direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citations and internal quotation marks omitted); *see also Coleman*, 667 F.3d at 860; *Everett*, 655 F.3d at 729; *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Not surprisingly, Defendants' Local Rule 56.1(a)(3) statement contains no facts that could constitute direct evidence of race discrimination.

"A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (citations and internal quotation marks omitted); *see also Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012); *Everett*, 655 F.3d at 729 (explaining that circumstantial evidence is "evidence that points to discriminatory animus through a longer chain of inferences"). Circumstantial evidence typically falls into one of three categories: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz*, 653 F.3d at 587; *see also Coleman*, 667 F.3d at 860; *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011). Defendants' Local Rule 56.1(a)(3) statement contains no circumstantial evidence that Defendants acted in a

discriminatory fashion. Brown claims that Smith spoke "down to her," but he did the same to two white employees and called another white employee a "cancer." Doc. 83 at ¶ 77. Brown also admits that Campbell (who is white) was treated unfairly in his termination, just as she claims she was. *Id*. at ¶ 78. Thus, the mere facts that she was spoken down to and terminated cannot give rise to an inference that those actions were taken on the basis of her race, and there is no record evidence that might cast those racially neutral incidents in a racially charged light.

The absence from the record of any of the sort of direct or circumstantial evidence necessary to prevent summary judgment under the direct method relegates Brown to the indirect method created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). The indirect method has three steps. First, the plaintiff must make a prima facie case of discrimination, which requires her to establish that (1) she is a member of a protected class, (2) her job performance met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than she was. *See Coleman*, 667 F.3d at 845. Second, if the plaintiff makes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. Third, if the defendant articulates such a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff, who must provide evidence that the defendant's stated reason is pretextual. *Id*. at 804-05. "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman*, 637 F.3d at 733-34 (brackets and internal quotation marks omitted).

Brown's case fares no better under the indirect method than under the direct method. It would be sufficient to observe that Defendants argue that they suspended and then fired Brown

because she was an extremely poor employee and that their Local Rule 56.1(a)(3) statement provides no factual basis that could lead the court to conclude that their rationale is pretextual. An alternative ground on which Brown's indirect method case fails is her inability to demonstrate that her job performance met Defendants' legitimate expectations, as required by the second element of the prima facie case. The court must examine Brown's job performance at the time of the challenged adverse actions, in December 2010 and January 2011, the date range to which Brown limited her EEOC charge, Doc. 83-1 at 2. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 753 (7th Cir. 2006) ("the critical inquiry is her performance at *the time of* her termination") (brackets and internal quotation marks omitted).

The facts set forth in Defendants' Local Rule 56.1(a)(3) statement and recounted at length above reveal that Brown's job performance during that period—and, indeed, throughout her time with Crothall—fell far short of her employer's legitimate expectations. Brown was rude, combative, unprofessional, and insubordinate, and Crothall's policies state that insubordination deserves a strong disciplinary response, potentially including suspension or termination. Doc. 83 at ¶ 9. Brown also failed to perform many duties that were assigned to her position or that her supervisors asked her to do, or performed them tardily or poorly. Finally, even when Brown was given a second chance after her suspension, she did not improve her behavior. Because the undisputed facts make it impossible for Brown to establish that she met her employers' legitimate expectations, Brown cannot satisfy the second element of the prima facie case, and therefore cannot forestall summary judgment under the indirect method. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 & n.3 (7th Cir. 2007) ("The client's complaint about Fane's communication style coupled with the abrasive e-mail she sent to her co-workers demonstrate that she was not behaving in the manner Locke Reynolds expected."); *Herron v.*

*DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) ("Herron's disrespectful and argumentative nature was continually on display at KTP. DaimlerChrysler clearly enunciated a desire to have supervisors who could successfully deal with subordinates, peers, and supervisors, and Herron did not meet this expectation.").

The foregoing covers Brown's December 2010 suspension and her January 2011 termination. The amended complaint claims more broadly that Brown was "treated differently than white employees at Crothall Healthcare INC, in terms of compensation, training, promotion, discipline, employment and accountability because of race." Doc. 18 at ¶ 6. The only disciplinary, accountability, or employment events that could constitute "materially adverse employment actions," *see Tart v. Ill. Power Co.*, 366 F.3d 461 (7th Cir. 2004); *Rogers v. Waukegan Public Sch. Dist. 60*, 2013 WL 589211, at *7-8 (N.D. Ill. Feb. 14, 2013), are Brown's suspension and termination, which are addressed above. There is no evidence in the record that pertains to the training or promotion opportunities that were offered to or withheld from Brown.

As for compensation, Defendants' Local Rule 56.1(a)(3) statement states that Brown received $1000 every two weeks upon her hiring in November 2007, that she had requested that salary on her employment application, and that she received a raise the next month after complaining to Campbell that she was being paid less than administrative assistants who started around the same time she did. Doc. 83 at ¶¶ 16-18. That short-term pay discrepancy—which falls outside of Title VII's 300-day statute of limitations but within the four-year statute of limitations applicable to Brown's § 1981 claims, *see Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 735-36 (7th Cir. 2006)—cannot create a triable dispute under either the direct or the indirect method. As stated above, there is no direct or circumstantial evidence that Defendants were ever motivated by discriminatory animus, as required by the direct method. True, one form of

circumstantial evidence is "evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment." *Diaz*, 653 F.3d at 587. But a single instance of a short-term pay disparity is the antithesis of "systematically" disparate treatment, and at any rate there is no evidence that the other administrative assistants mentioned in Defendants' Local Rule 56.1(a)(3) statement were "outside of the protected group," that is, there is no evidence that they were not African-American.

As for the indirect method, even assuming that Brown can satisfy her prima facie case, the undisputed facts support Defendants' assertion that the pay discrepancy occurred because Brown was simply paid the rate she had asked to be paid. That legitimate and nondiscriminatory explanation is buttressed by the fact that Defendants raised Brown's salary immediately when she requested the raise. And there is no evidence that this explanation is pretextual, as Brown must show to carry her burden at the third step of the indirect method. Perhaps Defendants were careless or made a mistake in paying Brown the rate she had requested rather than the rate paid to other new administrative assistants, but that does not suggest pretext; recall that "[p]retext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman*, 637 F.3d at 733-34 (brackets and internal quotation marks omitted).

Defendants' Local Rule 56.1(a)(3) statement makes no further references to Brown's pay. In particular, there is no indication that Brown was ever demoted or subjected to a pay decrease, or that she was paid less than other employees after the early discrepancy discussed above. The record does not indicate what compensation was paid to any employee other than Brown.

For these reasons, summary judgment is granted to Defendants on Brown's race discrimination claims.

**II.     Retaliation Claims**

Brown also claims that Defendants unlawfully retaliated against her when they fired her, in violation of Title VII and § 1981.  A court "appl[ies] the same elements to retaliation claims under Title VII and § 1981," *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009), so the court will refer only to Title VII in discussing Brown's retaliation claims.  The purpose of Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is to advance that statute's ban on employment discrimination "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006); *see also id*. at 68 (the "antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms … by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers") (citation omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

"A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof." *Stephens*, 569 F.3d at 786.  Under the direct method, a plaintiff "must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two." *Ibid*.  "Under the indirect method, the first two elements remain the same, but instead of proving a direct causal link, the plaintiff must show [3] that he was performing his job satisfactorily and [4] that he was treated less favorably than a similarly situated employee who did not complain of discrimination.  Once a plaintiff establishes the *prima facie* case under the indirect method, the defendant must articulate a nondiscriminatory reason for its action; if he does, the burden remains with the

plaintiff to demonstrate that the defendant's reason is pretextual." *Id*. at 786-87 (citation omitted).

Both methods require Brown to establish that she engaged in a statutorily protected activity. Title VII prohibits an employer from taking action against an employee "[1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The facts suggest two statutorily protected actions taken by Brown. First, after being suspended by Smith, Brown called Crothall's hotline to report that Smith "treats her unfairly because she is African American." Doc. 83 at ¶¶ 52, 79. Because treating employees unfairly on the basis of race can be a "practice made an unlawful employment practice by" Title VII, an employee's complaint about such treatment constitutes protected activity. *See Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 747-48 (7th Cir. 2010) ("Even if there is no investigation within the meaning of the statute, an employer is … forbidden to retaliate against an employee for opposing unlawful conduct. … [O]pposition, to be protected by the statute, must be based on a good-faith (that is, honest) and reasonable belief that it is opposition to a statutory violation."). By contrast, Brown's other complaints about Smith's behavior do not constitute protected expression under Title VII because they are not allegations that Smith had violated Title VII. *See Kodl v. Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 563 (7th Cir. 2007) ("To constitute protected expression, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of … harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.") (internal quotation marks omitted). Second, Brown filed an EEOC charge

alleging race discrimination, which is "clearly a protected activity under Title VII." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012). But that protected activity cannot ground a retaliation claim here because all of Defendants' alleged adverse actions against Brown occurred before she had filed her EEOC charge (which she filed three days after she was terminated), and therefore Defendants cannot have retaliated against her for that action. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) ("the theory doesn't work if the retaliatory act precedes the protected activity"). So the court will consider only Brown's allegation of race discrimination during her hotline call.

Brown cannot satisfy the other elements of either the direct or the indirect method with respect to that protected activity. On the direct method, she cannot possibly establish the third element—a causal relationship between the statutorily protected activity and the adverse employment action—because the uncontroverted facts show that Smith and Rothgery were not aware until *after* Brown was fired of her hotline complaint or of her view that she was being treated differently on the basis of race. Doc. 83 at ¶ 80. "Clearly, a superior cannot retaliate against an employee for a protected activity about which he has no knowledge." *Stephens*, 569 F.3d at 788. As for the indirect method, for the same reasons given above with respect to race discrimination, Brown cannot establish that she was performing her job satisfactorily; indeed, the uncontroverted facts establish that she was a very poor employee.

Because Brown cannot satisfy either the direct or the indirect method, Defendants are entitled to summary judgment on her retaliation claims.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is granted.

March 6, 2013

_____
United States District Judge